Herman J. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 63322.
United States Tax Court
T.C. Memo 1960-92; 1960 Tax Ct. Memo LEXIS 199; 19 T.C.M. (CCH) 475; T.C.M. (RIA) 60092; May 9, 1960
*199 Petitioner acquired from the owners an option to purchase certain lands. The total purchase price under the option was $85,800. Subsequently, petitioner caused the land to be conveyed to a third party for a total consideration of $382,050. The third party paid petitioner the purchase price and received a deed directly from the owners. Petitioner paid the owners the purchase price under the option. Held: In substance and in fact, petitioner sold the land itself to the third party and not the option and the gain resulting is taxable as a short-term capital gain. Held further: Petitioner may offset against that part of the purchase price received in each of the years 1950 and 1951 only the amounts he actually paid to the owners in those years. Held further: Amounts deductible for travel and miscellaneous expenses in connection with the sale, determined. Held further: Additions to tax under section 294(d)(2) denied. G. D. Walker, Esq., P.O. Box 24, Jonesboro, Ark., Jacob Rabkin, Esq., Alvin D. Lurie, Esq., for petitioner. Douglas M. Moore, Esq., for respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax and additions *200 to tax of petitioner for the calendar years 1950 and 1951 as follows: Additions to Tax
Calendar
Income Tax
Sec. 294
Sec. 294
Year
Deficiency
(d)(1)(A)
(d)(2)
1950
$116,036.81
1951
23,284.65
$2,557.98
$1,397.08
The following issues are before the Court for decision: (1) Whether the gains accruing to petitioner from the sale of certain property, a part of which gains was received in the taxable year 1950 and a part in the taxable year 1951, are taxable to petitioner as long-term capital gains or as ordinary income, or, alternatively, as short-term capital gains; (2) how much of these gains is attributable to the taxable year 1950 and how much is attributable to the taxable year 1951; (3) the amount of travel and miscellaneous expenses of petitioner which is properly deductible from the sale proceeds to determine net gain; and (4) whether petitioner is liable for addition to tax in 1951 under section 294(d)(2), Internal Revenue Code of 1939. All the other issues raised in the pleadings have been disposed of by written or oral stipulations. Findings of Fact The stipulated facts are found. Petitioner is an individual with residence at Batesville, Arkansas. His income tax returns for the calendar years *201 1950 and 1951 were prepared on the cash basis of accounting and were filed with the collector of internal revenue at Little Rock, Arkansas. Petitioner did not file a declaration of estimated tax in 1951. Petitioner became interested in manganese mining in 1939, and in 1949, he was president of Southern Mining and Manganese Company, which company owned and operated manganese properties located near Batesville, Arkansas. Petitioner also owned an interest in manganese properties adjoining those of Southern Mining and Manganese Company through membership in the Eagan Syndicate. On April 25, 1949, approximately 2,600 acres of additional manganese lands adjoining those of Southern Mining and Manganese Company were owned by J. Reed Denison and members of his family. These lands are hereinafter referred to as the Denison property. Actual title to these lands was spread among J. Reed Denison, his wife, Lottie May Denison, Lucille D. Jones, F. Ross Denison, Anita Denison, Walter L. Denison, Louise Denison, A. Milne Denison, Thelma Denison, Alvis F. Denison, Marie Denison, Shell D. Denison, Carmen Denison, Mary Irene White, and Sabelle Peters. All of these people are hereinafter referred to collectively *202 as the Denisons. J. Reed Denison had a power of attorney from all of these people, excepting Lottie Denison, his wife, and Lucille D. Jones, giving him broad powers in handling their interests in the Denison property. On April 25, 1949, J. Reed Denison, individually, his wife, Lottie Denison, Lucille D. Jones, and J. Reed Denison, as attorney in fact for all the other Denisons, executed a document labeled "Option to Purchase," hereinafter referred to as the option, in which they, as owners, granted to petitioner, in his individual capacity, as purchaser, an exclusive right and option to purchase specifically described parts of the Denison property totaling approximately 2,600 acres. This option provided further: "Said owners also hold title to undivided mineral interests in scattered fortys, list of which will be furnished upon request, and in the event purchaser desired to purchase any of same, owners will convey same for additional sum of $7.50 per acre. Any other mineral lands or mineral titles owned by said owners which may have been omitted from this list inadvertently, other than 700 acre pasture under contract to Rudy Byrd of Newport, will also be conveyed hereunder at additional *203 price of $20.00 per acre, at option of said purchaser. "Said Purchaser is hereby granted the right to exercise this option and purchase said lands at any time within ninety (90) days from date of this option, and additional 60 day time hereinafter provided for and time is of the essence of this option and all rights herein granted. "Notice of exercise of this option shall be given by said Purchaser to J. Reed Denison, at Batesville, Arkansas, within said ninety day period, and said owners shall thereupon convey to said Purchaser, or to such person or persons, firm or corporation, as may then be designated by said Purchaser to said J. Reed Denison, the lands hereinabove described by warranty deed containing usual covenants of warranty, and said purchaser shall pay to said J. Reed Denison the sum of Eighty-five Thousand, Eight Hundred ($85,800.00) Dollars as the full purchase price of said lands. "Upon notice by said purchaser at any time hereafter before the expiration of said ninety day period said owners shall have prepared abstract of title covering said lands and submit same for approval of Purchaser or his attorney. "During said ninety day period said purchaser is given the right *204 to go upon said lands and make such investigation of same as he deems proper to determine the location and extent of managanese or other mineral deposits on said lands, or any portion thereof, with free right of ingress and egress over, upon and across any or all of said lands for such purpose. "In the event said owners are not able to show to the satisfaction of Purchaser or his attorney a good and marketable title to any portion of said lands the purchase above mentioned shall be reduced $35.00 per acre for any such tract which shall not be conveyed under this option. "Owners reserve the right to continue operations of mines on said lands, or to open or re-open other mine workings on any of said lands until one-half of purchase price is paid, and also, to have exploratory work done on said lands, or any portion thereof as owners, or said J. Reed Denison, may deem advisable, and particularly to enter into contract with U.S. Bureau of Mines to carry on exploratory work on said lands for such period of time as U.S. Bureau of Mines may require. And said Purchaser, by acceptance of this Option to Purchase, hereby consents to all such exploratory operations and agees [ages] to join in *205 such contracts for explorations if required to do so. "Upon notice of exercise of this option being given by Purchaser within said ninety day period, said purchaser shall place in escrow in the First National Bank of Batesville, Arkansas, the sum of $24,000.00 guaranteeing his purchase hereunder, and pay to J. Reed Denison the sum of $1,000.00 to be used toward payment of expense of furnishing abstracts of title, and purchaser shall be given a reasonable time thereafter (not to exceed sixty (60) days) in which to have completed his examination and approval of title to said lands. Upon consumation [consumption] of transfer of title hereunder by payment in cash of balance due under this option to purchaser [purchase] said sum of $25,000.00 so advanced and placed in escrow shall be treated as part of the purchase price hereinabove provided for. "The homestead and dower rights of the said Anita Denison, Louise Denison, Thelma Denison, Lottie Denison, Marie Denison and Carmen Denison are hereby released unto said purchaser only to the extent of the rights herein granted. "The face of the option shows extensions as follows: "This Option is hereby extended to Oct. 15, 1949 for value received *206 this July 20, 1949. J. Reed Denison, Att'y in Fact, J. Reed Denison, Mrs. Lucille D. Jones "This Option further extended, for value received to Dec. 15, 1949 this Oct. 15, 1949. J. Reed Denison, J. Reed Denison, Att'y in Fact, Lucille D. Jones "For value received, this option is hereby further extended to June 10, 1950 this Dec. 15, 1949. J. Reed Denison, J. Reed Denison, Att'y in Fact, Lucille D. Jones "For value received the attached and foregoing Option to Purchase is hereby extended to Oct. 10th, 1950, as to all its terms and conditions. This June 7, 1950. Mrs. Lucille D. Jones, J. Reed Denison, J. Reed Denison, Att'y in Fact" The latter extension was acknowledged before a Notary Public on June 7, 1950. The signature of Lottie Denison does not appear on any of the extensions. The original intention of petitioner in acquiring the option was to purchase the Denison property through Southern Mining and Manganese Company. However, this company was unable to raise the necessary purchase money. Petitioner then attempted to raise money to purchase the property individually. He was unsuccessful in this. In December, 1949, petitioner was contacted by Harry H. Holloway, a former plant manager *207 for Republic Steel. Holloway indicated to petitioner that Republic Steel might be interested in purchasing the Denison property. Holloway also told petitioner that considerable time would be required for Republic Steel engineers to examine the property. At this time, Holloway made arrangements for one of the chief geologists of Republic Steel to go to Batesville. On the strength of this information, petitioner contacted J. Reed Denison and told him that he, petitioner, was going to sell the option and needed an extension. Petitioner also enlisted the help and assistance of J. Reed Denison in showing the property because Denison had mined the property for many years and was familiar with it. Petitioner paid J. Reed Denison $220 and entered into an agreement with him, which agreement reads as follows: "THIS AGREEMENT, made and entered into this 21 day of December, 1949, by and between Herman Miller and J. Reed Denison, "WITNESSETH: "Miller being the holder of an option to purchase Denison managanese lands in Independence County, Arkansas, and in order to handle said option as he desires, in consideration of services performed and to be performed by Denison relating to said optioned lands *208 hereby pays to Denison $220.00 cash and in the event Miller disposes of said option he is to pay Denison $10,000.00 (less the $220 this day paid) out of proceeds of sale of option. /s/ Herman Miller, /s/ J. Reed Denison" On December 15, 1949, the option was extended to June 10, 1950. When the petitioner decided to sell the option, he did not place the option for sale with a broker nor advertise it for sale. Republic Steel examined the Denison property and decided that it did not fit into their program. Holloway then requested petitioner to go to Cleveland, Ohio and Johnstown, Pennsylvania in order to properly describe the Denison property to officials of Westmoreland Steel Corporation (later renamed Westmoreland Manganese Corporation and hereinafter referred to as Westmoreland). Westmoreland was interested in the acquiring of manganese lands through Holloway, who later became president of Westmoreland. After considerable negotiation, and on October 10, 1950, petitioner entered into an agreement with Westmoreland as follows: "Herman Miller, Hereinafter termed 'Seller' and Westmoreland Steel Corporation, hereinafter termed 'Buyer', for value received each from the other, hereby mutually *209 agree: "Seller shall cause to be conveyed to Buyer by warranty deed a good and marketable title to the twenty-five hundred acres of land listed and described on the attached 'List of Lands', each page of which is identified by the signatures of the parties hereto for the sum and price of One Hundred and Fifty Dollars ($150.00) per acre, of which purchase price the Buyer now pays over to the First National Bank of Batesville, Arkansas, as Escrow Agent hereunder, the sum of One Hundred Thousand Dollars ($100,000.00), and now pays to the Seller the sum of One Thousand Dollars ($1,000.00) cash to be applied toward cost of procuring abstracts of title to said lands and expense of any curative work found to be necessary to perfect titles. Said whole sum now placed in escrow and paid to Seller shall be treated as part of the purchase price of said lands. "Seller shall have prepared abstract of title to said lands and thereafter immediately submit same to Buyer's attorney for examination so that title examination may be completed by December 30, 1950. Within fifteen (15) days after any abstract of title is delivered to Buyer's attorney said attorney shall furnish Seller's attorney a copy of *210 his title option setting forth any requirement he may make to show title to be good and marketable. "A warranty deed conveying a good and marketable title to said lands to the Buyer shall be before December 30, 1950, deposited with said Escrow Agent to be delivered to the Buyer upon full payment of the purchase price. If title is found to be good and marketable, the Buyer shall deposit the balance of the purchase price with the Escrow Agent at any time on or before December 30, 1950. "In the event title to any portion of said land is not good and marketable, the purchase price above provided for shall be reduced $150.00 per acre for any of said land having defective title and not conveyed to the Buyer. "In the event good and marketable title is not shown to as much as two thousand (2,000) acres of said land, then the Buyer may, at its option, decline to purchase any portion of said land and shall by said Escrow Agent be refunded the $100,000.00 escrow fund above mentioned. "The Seller shall deliver possession of said lands to the Buyer on the 31st day of October, 1950. "The Seller now hereby sells, transfers and assigns to the Buyer a certain option covering the lands herein referred *211 to as 'List of Lands', executed by J. Reed Denison et al. to the Seller dated April 25, 1949, the profits accruing to the Seller by the sale of said option being the moving consideration hereunder. "WITNESS the hands of the parties hereto this 10th day of October, 1950. /s/ Herman Miller, Seller WESTMORELAND STEEL CORPORATION
/s/ By Harry H. Holloway, Pres. Buyer" This agreement is hereinafter referred to as the Agreement. The "List of Lands" attached to the Agreement was identical with the lands listed in the option to purchase the Denison property held by petitioner. J. Reed Denison was killed in an automobile accident on September 3, 1950. Thereafter, his widow, Lottie Denison, was appointed administratrix of his estate and she represented all of the Denison title holders as trustee, in the handling of the Denison property. Petitioner was represented by J. J. McCaleb, an attorney, in the transactions concerning the Denison property. J. Reed Denison, and subsequently Lottie Denison, were represented by W. D. Murphy, Jr., an attorney. Westmoreland was represented by M. Fuller Highsmith, an attorney. On October 13, 1950, M. Fuller Highsmith, as attorney for Westmoreland, delivered *212 to J. J. McCaleb a check for $1,000 drawn payable to petitioner by Westmoreland and previously endorsed by petitioner. This money was disbursed by McCaleb for expenses in connection with obtaining abstracts of title on the Denison property. On October 20, 1950, an escrow agreement between petitioner and Westmoreland, together with checks totaling $100,000, drawn by Westmoreland and payable to petitioner but endorsed by him, were delivered to the First National Bank of Batesville, Arkansas by M. Fuller Highsmith. The escrow agreement reads as follows: "The First National Bank, Batesville, Arkansas
"Gentlemen: "We hand you herewith Agreement dated October 10th, 1950 between Herman Miller and Westmoreland Steel Corporation, wherein Herman Miller, 'Seller', agrees to cause to be conveyed to Westmoreland Steel Corporation, the 'Buyer', a good and merchantable title to the 2500 acres of land listed and described on the 'List of Lands' attached thereto, for the price of $150 per acre. Said Agreement recites that the Buyer now pays over to the First National Bank of Batesville, Arkansas, as Escrow Agent, the sum of One Hundred Thousand Dollars ($100,000.00), and states the terms and conditions *213 of the escrow arrangement. "Also handed you herewith is Buyer's check in the amount of Ninety Thousand Dollars ($90,000.00), and Buyer's check in the amount of Ten Thousand Dollars ($10,000.00), both to apply on the purchase price of said lands, the full purchase price on said lands being approximately Three Hundred and Seventy-Five Thousand Dollars ($375,000.00). "Herman Miller, the Seller, will, on or before November 30, 1950, cause to be delivered deeds conveying said 2500 acres of land to Westmoreland Steel Corporation, and will also deliver to you on or before said date the option covering said lands executed by J. Reed Denison, et al., referred to in said Agreement. "The option and deeds and fund of One Hundred Thousand Dollars ($100,000.00) will be held in escrow by your bank in accordance with the terms of the aforesaid Agreement. Before December 15, 1950, Herman Miller will furnish Westmoreland Steel Corporation with abstracts showing good and merchantable title and submit same to the company's attorney for title examination. If title is found to be good and merchantable, an additional sum of approximately Two Hundred and Seventy-Five Thousand Dollars ($275,000.00) will be *214 delivered to you as Escrow Agent on or before December 30, 1950, and the whole sum of approximately Three Hundred and Seventy-Five Thousand Dollars ($375,000.00) will be paid over by you to the Seller, and the deeds delivered to the Buyer, all in accordance with the escrow arrangement. /s/ Herman Miller WESTMORELAND STEEL CORPORATION
/s/ By Harry H. Holloway President "Receipt is hereby acknowledged of the above-mentioned checks in the amount aggregating One Hundred Thousand Dollars ($100,000.00) and the agreement dated October 10, 1950 between Herman Miller and Westmoreland Steel Corporation, and same will be held and handled strictly in conformity with the escrow arrangement. Except 'List of Lands' is not signed by the purchasers. Dated: October 20, 1950. FIRST NATIONAL BANK Batesville, Arkansas
By: H. A. Buschmann, Cashier" On October 20, 1950, upon the inistence of W. D. Murphy, Jr., attorney for Lottie Mae Denison, petitioner executed a document entitled "Partial Assignment of Funds Held in Escrow in First National Bank, Batesville, Arkansas." This document reads as follows: "Herman Miller, hereinafter called the Assignor, and Lottie Denison, acting in her own behalf and as agent *215 for Robert D. Denison, Augusta Jean Denison, his wife: Mrs. Katherine D. Tripp, Mrs. Nita Mae D. Insell, Nancy Lucille Jones; F. Ross Denison and Anita Denison, his wife; Walter L. Denison and Louise Denison his wife; A. Milne Denison and Thelma Denison, his wife; Alvis F. Denison and Marie Denison, his wife, Shell D. Denison and Carmen Denison, his wife, Helen Peters, Mary Irene White, hereinafter called the Assignee, hereby enter into the following assignment: "For and in consideration of the sum of One Dollar and other valuable consideration to Herman Miller in hand paid by Lottie Denison, in her own behalf, and acting as agent for the above named parties, listed as Assignee, Herman Miller makes the following assignment. "Whereas there is now on deposit with the First National Bank of Batesville, Arkansas the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00), under a certain escrow agreement between Westmoreland Steel Corp. and Herman Miller, and whereas the lands involved in the sales contract, attached to the said escrow agreement, belong to the Assignee, and whereas upon completion of the said sales contract that the Assignee will be entitled to the sum of Eighty-Four Thousand *216 Six Hundred Dollars ($84,600.00) less the sum of $35.00 per acre for any lands the title of which are not marketable. "Therefore, Herman Miller assigns, transfers and releases to Lottie Denison, acting in her own behalf and acting as agent for the Assignee, the sum of $84,600.00 now held by the First National Bank of Batesville, Arkansas, as the escrow agent under the sales contract with Westmoreland Steel Corp. Said assignment is made subject to the terms of said option of J. Reed Denison, et al. to Herman Miller dated April 25th, 1949. Upon the completion of said contract the Assignee will be entitled to $84,600.00, less $35.00 per acre in the event that any lands belonging to the Assignee are not marketable. The intention being to conform to the option contract on this point. "The First National Bank of Batesville, Arkansas, is given a copy of this assignment, and notice of receipt of same is hereby accepted on this the 20th day of October, 1950. EXECUTED IN TRIPLICATE ON THIS THE 20th day of October, 1950. HERMAN MILLER /s/ Herman Miller" In the lower left hand corner of this document, after the acknowledgment of the signature of petitioner, there appears the following: Accepted *217 Oct. 20, 1950, First National Bank, Batesville, Arkansas
By H. A. Buschmann, Cashr By a warranty deed dated October 18, 1950 and acknowledged by the grantors on dates between October 18, 1950 and November 8, 1950, the Denison property was conveyed in fee to Westmoreland. The grantors in the deed were: Mrs. Lottie Denison, Robert R. Denison, Augusta Jean Denison, Mrs. Katherine D. Tripp, Mrs. Nina Mae D. Insell, Nancy Lucille Jones, F. Ross Denison, Anita Denison, Walter L. Denison, Louise Denison, A. Milne Denison, Thelma Denison, Alvis F. Denison, Marie Denison, Shell D. Denison, Helen Sabelle Peters, Mary Irene White and Carmen Denison. This deed conveyed a total of 2,547 acres of the Denison property. The property described in the deed coincided with the property described in both the option and the Agreement, with the exception that 20 acres described in the option and Agreement were not included in the deed. There is no explanation of this but presumably title to this 20 acres was not found to be marketable. This warranty deed was deposited in escrow with the First National Bank of Batesville, Arkansas and was held by the bank until December 29, 1950. Under date of December *218 16, 1950, petitioner and Westmoreland entered into a Supplemental Agreement which provided as follows: "In lieu of a certain Sales Agreement entered into between the parties hereto on the 10th day of October, 1950, Herman Miller, hereinafter termed Seller, and the Westmoreland Steel Corporation, termed Buyer, for value received, each from the other, hereby mutually agree that in payment and discharge of the Buyer's obligation under said former agreement the Buyer has delivered to the Seller, or to persons designated by Seller, Twenty-Five Thousand Dollars ($25,000) in value of the capital stock of Westmoreland Steel Corporation, and has paid the sum of One Thousand Dollars ($1,000) cash to apply on the purchase price of property herein involved. And it is now agreed that the Buyer shall on or before December 30, 1950, pay to the Seller the sum of Seventy-Five Thousand Dollars ($75,000) cash, and at the same time deliver to the Seller Buyer's note payable to Seller for Twenty-Five Thousand Dollars ($25,000) due on or before January 30, 1951, and bearing interest at 4% per annum, and Buyer's notes payable to Seller for One Hundred Fifty-Six Thousand Fifty Dollars ($156,050) payable on *219 or before June 30, 1951, with interest at 4%, and upon delivery of said cash and notes to Seller, the Seller shall cause to be delivered to the Buyer the deed of the heirs of W. H. Denison, deceased, and J. Reed Denison, deceased, and one J. J. McCaleb, to the 2,547 acres of land covered by said former agreement. The One Hundred Thousand Dollars ($100,000) now in escrow in First National Bank, Batesville, Arkansas, shall before December 30, 1950 be delivered to Seller by said bank. "Both the Buyer and Seller and the grantors in said deed realize that titles to some portion of said land may not be found to be marketable. The question of marketability of title shall be determined as follows: Attorney for Buyer shall on or before January 15, 1951, in writing, advise J. J. McCaleb, Attorney for Seller, of any requirements or action he deems necessary to make title marketable; Seller shall thereupon fulfill such requirements before June 29, 1951. In the event it is not so determined by June 29, 1951 that titles to any of said lands upon which such title requirements have been made are marketable then Buyer shall reconvey any portion of said land not so determined to have marketable titles *220 to Mrs. Lottie Denison, Trustee, and Seller shall credit Buyer's notes due June 30, 1951 with the sum of One Hundred Fifty Dollars ($150.00) per acre for any of said lands reconveyed to Mrs. Lottie Denison, Trustee, for said reason. "This agreement is intended by the parties hereto to be in lieu of said former agreement and constitute their present agreement relative to all matters set forth in said former agreement of October 10, 1950, and that proper escrow letters and agreements will be drawn in conformity herewith directing the escrow agent, The First National Bank of Batesville, Arkansas to deliver said deed and pay over the One Hundred Thousand Dollars ($100,000) now held in escrow in conformity herewith. "WITNESS the hands of the parties hereto this 16th day of December, 1950. /s/ Herman Miller Seller WESTMORELAND STEEL CORPORATION
/s/ By Harry H. Holloway, President Buyer" On December 29, 1950, petitioner executed and delivered the following letter to the First National Bank of Batesville, Arkansas: "Southern Mining & Manganese Company, 425 1/2 East Main Telephone 1217, Batesville, Arkansas, December 29, 1950 "First National Bank, Batesville, Arkansas. "Gentlemen: "With reference *221 to the $84,800.00 fund which I assigned on October 10, 1950, * to Mrs. Lottie Denison on her own behalf and as agent of Denison heirs named in said assignment, which fund so assigned was part of the $100,000 placed in escrow in your bank under agreement between Westmoreland Steel Corporation and myself, and which escrow has been cleared; "You are now directed to unconditionally pay over to Mrs. Lottie Denison on her own behalf and as such agent the sum of $68,278.04 of said $84,800.00 fund; the balance of $16,521.96 will be held by you under said former assignment and handled and disbursed as follows: "Titles to certain of the lands involved in this transaction have not yet been approved as provided for in said assignment, and as same are approved, you will be notified of such approval by my attorney J. J. McCaleb, and Mr. M. F. Highsmith, attorney for Westmoreland Steel Corporation, at which time you will pay over to Mrs. Lottie *222 Denison on her own behalf and as such agent the sum of $34,046 per acre of each tract so approved. "In the event any balance of said fund of $16,521.96 remains after your handling and disbusing [disbursing] as above directed, you will dispose of such balance as you may be hereafter directed. Yours very truly, /s/ Herman Miller "Receipt is acknowledged of the above letter, and as therein directed said sum of $68,278.04 has been unconditionally paid over to Mrs. Lottie Denison on her own behalf and as such agent, and said balance of $16,521.96 will be handled and disbursed as above directed. This Dec. 29, 1950. FIRST NATIONAL BANK, By /s/ H. A. Buschmann Cashier" On the lower left hand margin of this letter there appears the following: Escrow closed fully December 28, 1951 On December 29, 1950, petitioner and Westmoreland executed and delivered to M. Fuller Highsmith the following document: "Mr. Fuller Highsmith, Attorney at Law, Batesville, Arkansas
"Dear Sir: "We hand you herewith a copy of Supplemental Agreement dated December 16, 1950, between Herman Miller, Seller, and Westmoreland Steel Corporation, Buyer, in which it is stated that as part of the purchase price of the 2,547 acres *223 of land the Buyer will deliver to the Seller certain notes payable on or before June 30, 1951, in the total sum of $156,050; that all parties realize that titles to some portion of said lands may not be found to be marketable, and that the marketability to all of said lands will be determined on or before June 29, 1951. "It has now been determined that title to 2,062 acres of said lands is marketable and that marketability of titles to the remaining 485 acres has not yet been determined, and both parties to said Supplemental Agreement have agreed that notes totaling $80,000 shall be held in escrow by you pending clearance of the titles to said 485 acres of land in accordance with the provisions of said Supplemental Agreement. "We hand you herewith four (4) notes of the Westmoreland Maganese Corporation in the amount of $20,000 each, payable to Herman Miller on or before June 30, 1951. Upon determination that additional 134 acres of said lands have marketable titles you will deliver one of these $20,000 notes to Herman Miller, and likewise deliver additional notes as titles are found marketable to additional 134 acre portions, delivering all of said notes if all of said 485 acres are *224 found to be marketable, but retaining one of said notes if as much as 130 acres of said land is not found to have marketable titles. If titles to any of the said lands are not found to be marketable on or before June 30, 1951, you will so advise each of us in writing, and we will have final settlement between ourselves in conformity with said Supplemental Agreement. You will dispose of any notes remaining in your possession in accordance with further instructions to be given you by the parties hereto at that time. /s/ Herman Miller WESTMORELAND STEEL CORPORATION
By: /s/ Harry H. Holloway President" In the lower left hand corner of this document appears the following: "Receipt is hereby acknowledged of the above mentioned Supplemental Agreement and notes in the amount aggregating $80,000, and same will be held and handled strictly in conformity with above terms and conditions. Dated: December 29, 1950 /s/ Fuller Highsmith, Fuller Highsmith, Batesville, Arkansas" Handwritten notations appear at the bottom of this document as follows: "9/4/51 Received of M. F. Highsmith three notes in amount of $20,000 each. His Herman X Miller, Mark Witness: M. F. Highsmith, 12/28/51 Received of M. F. *225 Highsmith one note in amount of $20,000. /s/ Herman Miller" On December 29, 1950, the deed conveying the Denison property to Westmoreland was duly recorded. The obligation of petitioner to pay J. Reed Denison $10,000 arising under the agreement between petitioner and J. Reed Denison dated December 21, 1949, was compromised on December 29, 1950, for a total figure of $8,720, because J. Reed Denison passed away before the transaction with Westmoreland was completed and all the services contemplated were not rendered. Petitioner paid Mrs. Lottie Denison an additional $8,500 in 1952. This money was distributed among the Denisons in the same proportion as the money from the sale of the Denison property. In his income tax return for the year 1950, petitioner reported gain on the transaction involving the Denison property as follows: Price to be paid by Westmoreland Manganese Corporation upon
delivery of deed by J. Reed Denison and others
$382,050.00
Less withheld by purchaser pending approval of titles to 485 acres
and conditioned upon delivery of titles satisfactory to Attorneys
of Purchaser
80,000.00
Total
$302,050.00
Denison Heirs
Paid to Denison Heirs by First National Bank of Batesville as
Escrow Agent
$ 68,278.04
Herman Miller
Paid to Herman Miller
$116,200.00
Notes of Westmoreland Manganese Corporation
76,050.00
Stock in Westmoreland Corporation
25,000.00
Received by Herman Miller
$217,250.00
In hands of escrow agent to be paid to Denison Heirs if title require-
ments are met
16,521.96
Total
$302,050.00
Gross Amount Received for Option
$217,250.00
Less: Expenses of Sale
Commissions - Harry M. Holloway
$16,050.00
H. E. McBride
7,500.00
Expenses of showing land to prospects, entertain-
ment, geological information, etc.
2,892.00
Traveling Expenses in connection with sale
1,782.50
Legal Fee - Joe McCaleb
3,000.00
Total Expense of Sale
$ 31,224.50
$186,025.50
Less Paid to J. Reed Denison for Option
8,720.00
Net Profit from Sale
$177,305.50
*226 In his income tax return for 1950, the petitioner itemized the traveling expenses claimed above as follows: 1-16-50 to 1-22-50
Batesville, Arkansas to Washington, D.C. and Return
3,025 Miles
$ 302.50
Hotels, Meals
200.00
2-11-50
Batesville, Arkansas to Little Rock and Reutnr [return]
240 Miles
25.00
Meals & Entertainment
6.00
2-25-50
Batesville, Arkansas to Little Rock, Arkansas and Re-
turn
240 Miles
$ 24.00
Meals & Entertainment
8.00
8-12, 13, 14-50
Batesville Arkansas to Cleveland, Ohio and Return
R. R. Fare, Hotels, Meals
120.00
10-8 to 10-11-50
Washington, D.C. and Return
Plane Fare and Hotels
214.00
10-24 to 10-27-50
Washington, D.C. and Return
Plane Fare and Hotels
287.50
11-19 to 11-21-50
Washington, D.C. and Return
Plane Fare and Hotels
260.00
11-30 to 12-7-50
Little Rock to Washington, D.C. and return
Plane Fare and Hotels
335.50
$1,782.50
The respondent determined petitioner's gain in 1950 resulting from the Denison property transaction as follows: Total consideration paid by Westmoreland under contract with
Miller dated October 10, 1959 (2602 acres at $150 per acre)
$309,300.00
Less: Initial payment to J. Reed Denison et al.
$ 8,720.00
Payments to J. Reed Denison et al. through
escrow
68,278.04
Commission paid Harry M. Holloway
16,050.00
Commission paid H. E. McBride
7,500.00
Legal Fee paid Joe McCaleb
3,000.00
Total Deductions
103,548.04
Profit Realized
$205,751.96
*227 On brief, respondent concedes that petitioner incurred and paid $2,337.25 in 1950 in showing the Denison lands to prospects, entertainment expense, geological information, travel expense and other miscellaneous expense on the sale of the Denison property. The effect of this concession is to reduce the respondent's determination of the 1950 gain from the Denison property transaction to $203,414.71. Respondent now contends that $203,414.71 is the gain realized by petitioner in 1950. On brief, petitioner concedes the correctness of respondent's determination that the total amount paid by Westmoreland under the contract with petitioner dated October 10, 1950, was $309,300 rather than $302,050 as reported by petitioner in his 1950 return. As of the end of 1950, Westmoreland had accepted title to 2,062 acres of the Denison property, and 485 acres remained to which title had not been accepted. Of the 485 acres remaining, title to all but 102 acres was accepted by Westmoreland in 1951. The 102 acres were quitclaimed back to Lottie Denison, Trustee, by Westmoreland in 1951. By deed dated December 28, 1951, Lottie Denison, Trustee, and others, conveyed other acreage to Westmoreland which was *228 accepted by Westmoreland in lieu of the 102 acres. On September 4, 1951, $60,000 in notes held by M. Fuller Highsmith under the letter agreement between petitioner and Westmoreland dated December 29, 1950 were delivered to petitioner. The remaining $20,000 note was delivered to petitioner on December 28, 1951. The fair market value of the notes totaled $80,000 when received by petitioner in 1951. On September 4, 1951, the First National Bank of Batesville, Arkansas credited to the account of Mrs. Lottie Denison and Mrs. Lottie Mae Denison, Agent, the sum of $13,121.96 of the funds held under the escrow arrangement established by the "Partial Assignment of Funds Held in Escrow in First National Bank, Batesville, Arkansas" executed by petitioner on October 20, 1950. The remaining $3,400 of this fund was credited to the account of Lottie Denison, Agent, on December 28, 1951. In his income tax return for the year 1951, petitioner reported gain on the transaction involving the Denison property as follows: Amount paid by Westmoreland Mining and Manganese Company
$80,000.00
25 trips to St. Louis and return
17,415 miles at $.10
$1,741.50
Meals
239.22
13 trips Batesville to Little Rock and return
2700 miles at $.10
270.00
Hotel & Meals
120.45
Commission paid to Peter Mestrovic
400.00
Total
2,771.17
$77,228.83
Deposited in Escrow for Land Owners
16,521.96
Net Sales Price
$60,706.87
*229 The respondent determined petitioner's gain in 1951 resulting from the Denison property transaction as follows: Total consideration paid by Westmoreland under contract with
Miller dated October 10, 1950 (485 acres at $150 per acre)
$72,750.00
Less: Payments to J. Reed Denison et al. through escrow
16,521.96
Commission paid Peter Mestrovic
400.00
Total Deductions
$16,921.96
Profit Realized
$55,828.04
On October 28, 1958, the building in Batesville, Arkansas, in which the records of Westmoreland were stored, and in which petitioner's personal office was located, was burned. The records of Westmoreland were completely destroyed and many of the records of petitioner were destroyed. Petitioner exercised the option to purchase the Denison property some time between October 6 and October 18, 1950. By the Agreement of October 10, 1950, petitioner contracted to sell the Denison property to Westmoreland. No part of the gain realized by petitioner was in consideration of the sale, assignment or transfer of the option. Petitioner received $309,300 from Westmoreland in 1950 on account of the purchase by Westmoreland of the Denison property. This sum constituted payment by Westmoreland for 2,062 acres of the *230 Denison property. In 1950, petitioner paid the Denisons $68,278.04 for these 2,062 acres. In 1951, petitioner received $72,750 from Westmoreland on account of the purchase by Westmoreland of the Denison property. This sum constituted payment by Westmoreland for the remaining acreage. In 1951, petitioner paid the Denisons $16,521.96 for this remaining acreage. In 1950, petitioner incurred and paid, in addition to those expenses allowed by respondent in his determination, the following expenses in connection with the sale of the Denison property: Expenses of showing land to prospects,
entertainment, geological informa-
tion, etc.
$2,892.00
Traveling expenses
1,782.50
Total
$4,674.50
Opinion The first issue presented is whether the gains accruing to petitioner in 1950 and 1951 from the sale of the Denison property are taxable as long-term capital gains under the provisions of section 117, Internal Revenue Code of 1939, or as ordinary income, or, as respondent alternatively contends, as short-term capital gains. The petitioner contends that what he sold to Westmoreland by the Agreement of October 10, 1950 was nothing more than the option and that because the option was a capital asset and had *231 been held by him since March, 1949, the gain realized is a long-term capital gain and taxable under the provisions of section 117 of the 1939 Code. On the other hand, respondent contends that if what petitioner sold to Westmoreland was, in fact, the option, then the profits accruing to petitioner constituted ordinary income because these profits were realized from the sale of property held by petitioner for sale in the ordinary course of business. Respondent alternatively contends that, in substance and in fact, petitioner sold the Denison property itself to Westmoreland and that petitioner had held the Denison property for a period less than six months, therefore, the gains accruing to petitioner from the sale constituted short-term capital gains. The ultimate solution of this issue depends upon a determination of precisely what it was that petitioner sold to Westmoreland by the Agreement of October 10, 1950. Both parties point to the various documents and other evidence as supporting their respective contentions. Upon analysis of these documents and the transactions that occurred, as revealed by the evidence, we are convinced that petitioner did not sell only the option to Westmoreland. *232 By the Agreement of October 10, 1950, petitioner undertook to "cause to be conveyed to Buyer [Westmoreland] by Warranty Deed a good and marketable title" to the Denison property. In the same agreement, there is a provision that petitioner "hereby sells, transfers and assigns to the Buyer [Westmoreland] a certain option" on the Denison property, and that "the profits accruing to the Seller [petitioner] by the sale of said option being the moving consideration hereunder." Petitioner points to this latter provision as supporting his contention that what he sold to Westmoreland was the option. However, this contention is at least initially contradicted by the provisions of the agreement itself. Petitioner undertook to "cause title to be conveyed" to Westmoreland. If petitioner was to perform this obligation, he had to be in a position to demand a deed from the Denisons and the only means he had to accomplish this was by exercising the option. In his testimony, petitioner denied that he ever exercised the option. If petitioner transferred the option to Westmoreland without exercising it, then Westmoreland would have had to exercise it. There is no evidence that Westmoreland ever exercised *233 the option. Indeed, there is no evidence that the option ever was formally exercised. What evidence there was regarding the exercise of the option came from W. D. Murphy, Jr., attorney for J. Reed Denison and Mrs. Lottie Denison. Murphy testified as follows: "Q. Now, in view of that feeling, will you state what your position was as to the notice required to exercise the option? "A. Well, from our standpoint, the time-liness of any notice was not involved. If someone had asked us to give them an extension, we would have granted it. We wanted to sell the land. We wanted to get the $35 an acre, or whatever the consideration was. We were interested in the sale and this had been pending for sometime and since these negotiations at that time seemed to us to be the nearest we were coming to a sale, we wanted to go through with it. "Q. Then, you say you received notice from Mr. McCaleb that the Westmoreland Company had agreed to take the land? "A. Yes. The notice was given by Mr. McCaleb that they were going to take the lands. We also knew from my conversations with Mr. Hysmith [Highsmith] that they had put up $1,000 for the abstract. "Q. As far as your clients were concerned, did you demand *234 or require any further notice? "A. No, sir. No further notice was required." Later in his testimony, Murphy stated as follows: "Q. Can you tell us when Mr. McCaleb first gave you information that the Westmoreland people were going to take the Denison land? "A. I cannot give you the date, as far as saying it happened on September 28, or October 4th, or anything like that. I do know that a time prior to, possibly two weeks prior to the actual disbursement of the funds in escrow, that all of this title matter came up with reference to how the abstracts were going to be handled, and at that time Mr. McCaleb was very happy in that he thought, and advised me that the lands had been sold, but I cannot give you a date, sir, or tell you whether it happened in my office, or his office. There are no details I can give you on that. "Q. Actually, you do not know the date? "A. No, sir, except as I qualified in the earlier statement as to the times I felt reasonably sure it did occur." Still later in his testimony, Murphy stated as follows: "Q. Mr. Murphy, your clients, the Denisons, would have gone through with the transactions to sell their lands whether the notice was timely or untimely under *235 the option? "A. I think so." It would appear from this testimony that the nearest thing to a formal exercise of the option was the notice given by McCaleb to Murphy that Westmoreland was going to take the Denison property. Further, Murphy sets the date of this notice at a time approximately two weeks prior to the "disbursement" of the money in escrow. Westmoreland placed $100,000 in escrow on October 20, 1950. The deed from the Denisons to Westmoreland bore a date of October 18, 1950. On October 13, 1950, M. F. Highsmith delivered a $1,000 check (payable to petitioner and endorsed by him) to McCaleb to pay the expenses in connection with obtaining abstracts of title on the Denison property. Certainly, the option was exercised no later than October 18, 1950 when the deed was prepared and acknowledged by some of the grantors. A date two weeks prior to the placing of the funds in escrow would be October 6, 1950. It is therefore reasonable to assume that the option was exercised at some time between October 6, 1950 and October 18, 1950 and we so hold. As to whether petitioner or Westmoreland exercised the option, the fact that petitioner was represented by McCaleb would, at the outset, *236 indicate that McCaleb gave notice to Murphy on behalf of petitioner. In any event, the transactions that followed the exercise of the option indicate quite clearly that it was petitioner who exercised the option. Had Westmoreland exercised the option, simple prudence would have dictated that Westmoreland pay the purchase price of the Denison property under the option directly to the Denisons. Westmoreland, on the contrary, never had any transactions with the Denisons. Westmoreland looked to petitioner to produce a deed conveying marketable title to Westmoreland. The purchase money under the Agreement of October 10, 1950 was placed in escrow by Westmoreland for the sole benefit of petitioner. The escrow agreement of October 20, 1950 between petitioner and Westmoreland under which Westmoreland placed $100,000 in the First National Bank of Batesville, Arkansas, provides that petitioner "will on or before November 30, 1950 cause to be delivered deeds conveying said 2500 acres" and further that petitioner, before December 15, 1950, "will furnish Westmoreland Steel Corporation with abstracts showing good and merchantable title and submit same to the company's attorney for title examination." *237 Upon production of the requisite deeds, and upon acceptance of title, the escrow agent was directed to pay the money to petitioner. The Denisons were not even mentioned. On the contrary, the Denisons were looking to petitioner for the purchase price prescribed in the option and obtained from him the "Partial Assignment of Funds Held in Escrow in First National Bank, Batesville, Arkansas," dated October 20, 1950. Murphy, the attorney for J. Reed Denison and Mrs. Lottie Denison, testified as to the circumstances of this partial assignment as follows: "Q. Now, will you explain the occasion which prompted the preparation of the instrument? "A. This was at the time the $100,000 was placed in escrow at the First National Bank, and I felt since my clients were interested in some $84,000 of it, that there should be a more definite protection afforded them and the purpose of the Assignment was to give to my clients as much protection as could be given and to my knowledge and my way of thinking, this assignment protected them almost the $84,000. It afforded them that protection. " If petitioner had disposed of the option to Westmoreland and Westmoreland had exercised it, upon what basis did *238 Murphy obtain an assignment of the purchase price of the lands from petitioner? And why did petitioner pay the purchase price to the Denisons? The obvious answer is that petitioner acquired a right to the Denison property upon exercising the option and then sold that property to Westmoreland. When petitioner assigned, out of the $100,000 placed in escrow by Westmoreland, the purchase price due the Denisons under the option, he, in legal effect, placed the purchase money due under the option in escrow for the benefit of the Denisons. When, on December 29, 1950, Westmoreland released the escrow funds to petitioner upon approval of 2,062 acres of the Denison property, petitioner released a portion of the purchase price from the escrow arrangement he had with the Denisons. We recognize the fact that petitioner never actually held legal title. The deed went directly from the Denisons to Westmoreland. However, the situation here is no different from that in H. G. Butler, 43 B.T.A. 1005.In that case, Butler held a "Lease and Option Agreement" with Crittenden. Under this agreement Butler leased mineral rights from the owner, Crittenden, and at the same time, had an option to purchase the *239 fee title to the mineral rights for $5,000. On July 15, 1937, Butler granted to Lay, as agent for Ball, an option to purchase the fee title to the mineral rights within 90 days for $36,000. Within the 90 days, Lay, as agent, notified Butler that he was exercising the option to purchase and deposited a check for the purchase price in escrow which check was dated August 27, 1937. On or about September 10, 1937, Butler delivered his check for $5,000 to Crittenden and on that same date, Crittenden executed and delivered to Ball a general warranty deed conveying to Ball the fee title to the mineral rights. At about the same time, the escrow agent delivered the check for the purchase price to Butler. In holding that what Butler sold to Ball was the fee title to mineral rights and that such fee title was held by petitioner for a short time less than a year, this Court said: "Petitioner [Butler] argues that, while he had the right to exercise his option to purchase the mineral rights from Crittenden, he 'never took title to the property' and so he sold something other than title to the mineral rights to Lay and his principal, Ball. Petitioner appears to place reliance upon the factor that *240 the deed to the mineral rights was from Crittenden to Ball. It is true that there were not two deeds, one from Crittenden to petitioner and one from petitioner to Ball, but in view of the fact that petitioner apparently exercised the option he had by giving his check for $5,000 to Crittenden, and that Ball did not pay anything to Crittenden, it appears that all parties concerned eliminated one step in an economy of effort and that the deed from Crittenden to Ball was in reality a deed on behalf of petitioner, conveying title which he had acquired under exercise of his option, to Ball, who exercised the option he obtained from petitioner. In our opinion, the substance rather than the form of the transaction is controlling. "We believe that petitioner can not say that he did not exercise his option under the lease and option agreement of September 15, 1934. Petitioner paid $5,000 to Crittenden. Neither Lay nor Ball paid anything to Crittenden. When petitioner paid $5,000 to Crittenden, Crittenden did not have thereafter any title to the mineral rights to convey to Ball except as agent for petitioner. * * *
"All of the evidence upon its face indicates that petitioner exercised his option, *241 thereby acquiring title to the mineral rights, and Ball exercised his option under his agreement with petitioner and acquired title to the mineral rights from petitioner. All was done at about the same time and we believe it is immaterial that a deed to petitioner was not executed, and that the deed received by Ball was executed by Crittenden. * * *" We conclude that petitioner sold the Denison property to Westmoreland. We further conclude that he, in substance, acquired that property by an exercise of his option to purchase some time between October 6, 1950 and October 18, 1950. The right, title and interest which petitioner acquired in the Denison property upon his exercise of the option was a capital asset which he held for a period of less than six months. Accordingly the alternative contention of respondent is sustained. Cf. Barber v. United States, 115 F. Supp. 349, affd. 215 F. 2d 663, certiorari denied 348 U.S. 897 (1954); Louis D. Blick, 31 T.C. 611, affd. 271 F. 2d 928. The second issue is how much of the gains accruing to petitioner from the sale of the Denison property is attributable to 1950 and how much is attributable to 1951. Both parties are agreed that petitioner *242 received $309,300 in 1950 and $72,750 in 1951 from Westmoreland on account of the purchase of the Denison property. The issue lies in the treatment to be accorded to the payment by petitioner to the Denisons of the purchase price of the Denison property under the option. The purchase price for the entire tract under the option was $85,800. Of this amount $1,000 was paid through the advance made to secure abstracts of title. The remaining $84,800 was assigned by petitioner to the Denisons through the "Partial Assignment of Funds Held in Escrow in First National Bank, Batesville, Arkansas." The amounts actually received by the Denisons under this assignment were $68,278.04 in 1950 and $16,521.96 in 1951. Petitioner seeks to offset the entire amount of $84,800 against the receipts of 1950 in order to determine gain for that year. Respondent would allow $68,278.04 in 1950 and $16,521.96 in 1951. The evidence reveals that as of the end of 1950, title to 2,062 acres of the Denison property had been approved. Petitioner had been paid by Westmoreland, for this 2,062 acres, the total sum of $309,300. Petitioner had assigned to the Denisons an amount equal to the total purchase price under the *243 option (less the advance for abstracts) which was $84,800. The Denisons had conveyed the entire tract of 2,547 acres to Westmoreland and that deed was recorded on December 29, 1950. However, petitioner apparently released to the Denisons only an amount sufficient to pay them for the 2,062 acres to which title had been approved. In the letter of December 29, 1950, in which petitioner directed the First National Bank of Batesville, Arkansas to pay over $68,278.04 to Mrs. Lottie Denison, reference is made to the fact that titles to certain of the lands have not yet been approved and the letter instructs the bank that the remaining amount of the purchase price due the Denisons ($16,521.96) shall be paid over to Mrs. Denison as these titles are approved and that the payments shall be made at the rate of $34.046 per acre for each acre, title to which is approved. It thus seems clear that in 1950 petitioner paid the Denisons $68,278.04 for the 2,062 acres of the Denison property which he sold to Westmoreland for $309,300. The remaining amount of the purchase price due under the option ($16,521.96) was paid to the Denisons in 1951 when the remaining 485 acres, or the substitute acres, were *244 accepted by Westmoreland and Westmoreland paid petitioner for them. While it is true that the "Partial Assignment of Funds, etc." executed by petitioner on October 20, 1950 purports to assign the entire $84,800 purchase price to the Denisons out of the $100,000 deposited in escrow by Westmoreland, the subsequent documents and transactions reveal quite clearly that what petitioner did in fact was pay the $84,800 into escrow, to be paid to the Denisons as title was approved. Petitioner did not relinquish his rights to any more than $68,278.04 in 1950 and the balance of $16,521.96 was released in 1951. It follows from this that the respondent's determination that petitioner may offset $68,278.04 in 1950 and $16,521.96 in 1951 is sustained. The third issue is the amount of travel and miscellaneous expenses of petitioner which are properly deductible from the gains accruing from the sale of the Denison property in order to determine the net gain. The issue arises in the taxable year 1950. In his 1950 return, petitioner listed the following expenses as deductions from gains in determining net gains: Expenses of showing land to pros-
pects, entertainment, geological
information, etc.
$2,892.00
Traveling expenses
1,782.50
Total
$4,674.50
In *245 the notice of deficiency, respondent disallowed both these items in their entirety. On brief, however, respondent concedes that petitioner incurred and paid $2,337.25 in 1950 in showing the Denison property to prospects, entertainment expense, geological information, travel expense, and other miscellaneous expense on the sale of the Denison property. In his return, petitioner itemized his claimed traveling expenses but there was no breakdown of the other claimed expenses. The evidence presented by petitioner with regard to these claimed expenses consisted of his own testimony as follows: "Q. On your return for 1950, there is a schedule showing expenses incurred by you in connection with the Denison deal, and it is Schedule 1(d) on the return, and I would like to show that to you. That lists various trips made by you during 1950 in connection with your transactions relating to the Denison land? "A. Yes, sir. "Q. Many of the trips are to the east, are they not, Mr. Miller? "A. Yes, they are. Several of them are to the east, four or five. Six I guess. "Q. To the best of your recollection, Mr. Miller, did you make those trips listed on those returns, listed on the schedule? "A. Yes, *246 sir. "THE COURT: Is this item not considered one of the small items in the concessions? "MR. MOORE: That is right, Your Honor. This is a part of the adjustment he claims as a reduction to capital gain reported, and it is included in the A Adjustments. "Q. Did you make the trips listed on that schedule on that return? "A. Yes, sir, I certainly did. "Q. Were those trips made in connection with the Denison land transaction? "A. Yes, sir, they were. "Q. Did you incur the expenses listed on that schedule in connection with those trips? "A. Yes, I did. "Q. Mr. Miller, at the time that return was prepared, did you furnish your accountant with the details with respect to these items? "A. Yes, sir, I did. "Q. Mr. Miller, on the return for 1950, there was an item of $2,892 and it is listed as 'Expenses of showing land to prospects, entertainment, geological information, et cetera'. Will you tell us what those expenses were? "A. Would you give me that again? "Q. On your return for 1950, you have an item of $2,892, listed as 'Expenses of showing land to prospects, entertainment, geological information, et cetera'? "A. Yes. "Q. To the best of your recollection were expenses of this type incurred *247 in connection with the Denison option? "A. Yes, of course, we had a lot of work, and lot of reports and things to get ready. "Q. Did you entertain prospects in that connection? "A. Yes. They would come to Batesville and I would have to keep them there. "Q. To the best of your recollection, did you incur this expense of $2,892? "A. Yes, sir, to the best of my recollection. I sure did." Later in his testimony, petitioner stated as follows: "Q. You have testified that you incurred certain travel expenses in 1950 and certain other expenses of showing land to prospects, and for entertainment, et cetera, in 1950. Do you have any documents, checks, receipts, or any other type of documents or documentary evidence by which you can substantiate those expenditures? "A. We did have. They were destroyed in the fire we had which burned out a whole block in Batesville in October. "Q. Did you turn that information over to your accountant? "A. Yes. "Q. Did he prepare work sheets? "A. I think he did so. "Q. Were the work sheets destroyed in the fire? "A. I would not know that." The parties stipulated that a fire destroyed many of the records of petitioner. Petitioner testified that the records he kept *248 of these expenditures were destroyed in the fire but that he had actually expended the sums set forth in the return. Under the circumstances, it is considered that petitioner's uncontradicted testimony warrants the allowance of the entire amounts claimed in the return. H. L. Scales, 10 B.T.A. 1024; see also A. F. Rees, 21 B.T.A. 698; R. P. Shea, 24 B.T.A. 798; Cohan v. Commissioner, 39 F. 2d 540. The respondent's determination disallowing these items of expense is not sustained. The fourth issue is whether petitioner is liable for additions to tax in 1951 under section 294(d)(2), Internal Revenue Code of 1939. Petitioner did not file a declaration of estimated tax for 1951 and the parties have stipulated the additions to tax under section 294(d)(1)(A) arising from such failure. The additions to tax under section 294(d)(2) have not been argued on brief and are deemed to have been abandoned by respondent. In any event, under the decision in Commissioner v. Acker, 361 U.S. 87, respondent's determination of additions to tax under section 294(d)(2) is denied. Decision will be entered under Rule 50. Footnotes
*. "The only assignment of record is dated October 20, 1950 and the amount assigned is $84,600. However, consistency dictates that the assignment of October 20, 1950 is the one referred to and that $84,800 was the correct and intended amount of the assignment."↩